## William Moudy v. William Snider.

1. QUESTIONS OF FACT—*For the Jury.*—The determination of questions of fact is for the jury, and when there is evidence to support its finding the verdict will not be disturbed.

2. NEW TRIALS—*Newly Discovered Evidence.*—When the newly discovered evidence upon which a new trial is asked is not of such a character as would be likely to produce a different result, the motion is properly denied.

Assumpsit, for money had and received. Appeal from the Circuit Court of Ford County; the Hon. CHARLES R. STARR, Judge, presiding. Heard in this court at the May term, 1895. Affirmed. Opinion filed December 6, 1895.

C. H. PAYSON and J. H. MOFFETT, attorneys for appellant.

COOK & MOFFETT and E. C. GRAY, attorneys for appellee.

MR. PRESIDING JUSTICE PLEASANTS DELIVERED THE OPINION OF THE COURT.

This action, commenced by appellee on March 14, 1894, was tried on the 5th of the following December, and resulted in a verdict and judgment for plaintiff for $111.70. Defendant appealed.

The declaration was in assumpsit on *indebitatus* counts for money had and received, money loaned, work and labor, and interest, and the pleas were *non assumpsit*, payment, set-off and accord and satisfaction.

The claim was for money due plaintiff on a note he left with the defendant in January, 1893, which he collected on March 7, 1894, and refused to pay over the proceeds on plaintiff's demand.

It is conceded that the judgment is correct, unless the defendant by a preponderance of the evidence proved the set-off claimed, which was $100 and interest from August 2, 1892.

Appellant was a farmer living in Champaign county. Appellee was a farm laborer and well borer, and worked for appellant at different times for different periods ranging from days to months. They were on very friendly terms.

On August 1, 1892, appellee came to appellant's house to assist him in haying. He finished his job and left in the evening of the next day. Appellant testified that on July 30th he drew from Ford County Bank at Paxton $125 in three bills of $100, $20 and $5; spent the smaller bills, excepting some change, in Paxton, on that day, and took home the residue in his pocket-book—the $100 bill on one side and the change on the other; that in the afternoon of August 2d, while appellee and he were working alone in the hay mow, he wrapped his knife, watch, and pocket-book, closed, in his handkerchief, and so placed them under one of the braces in the mow. At quitting time in the evening he went to get them, found the pocket-book unclasped on the side containing the change—which seemed to be all there—and put it in his pocket. While at the supper table, but after appellee had eaten and gone, the question how it came to be so unclasped suddenly arose in his mind, and on taking it out of his pocket and looking on the other side found it empty. He went to the barn to look for the money but did not find it. He at once suspected appellee, because he was the only other person in the mow that afternoon except a young girl who worked there and came up for fifteen or twenty minutes "to talk a little and gas." But he said nothing about it to anybody, thinking he would hear of his using it. He hired him for two months of the following winter for the purpose of watching him, and

treated him as before, but discovered nothing to confirm his suspicion. Appellee appeared to be friendly as he had ever been. It was during that period of his employment that he left with him $55 in money, one note for $110 and another for $90, and had a balance due him on a horse trade of $5.

In February, 1894, appellant first heard that soon after the money was missed, appellee was seen by several persons at different times to have in his possession a $100 bill, and thereupon charged him with having taken it from his (appellant's) pocket-book; which appellee defiantly denied. After several talks between them appellant returned the money and uncollected note, and paid him the balance due on the horse trade and a part of the proceeds of the note he had collected, but retained the amount of the missing bill and interest thereon from the day it was missed; and refusing to pay that, this suit was brought.

The only ultimate question of fact in the case was whether appellee got the $100 bill as charged; upon which the burden of proof to establish the affirmative was upon appellant. Not one of the circumstances relied on, except that of his being with appellant in the hay mow, so far as they were claimed to be significant, was certainly shown, even by the witnesses for appellant, and were all except the one stated, positively denied by appellee, whose denial was more or less supported by reasonable probabilities and natural inference from their testimony.

Three witnesses testified to as many occasions on which he exhibited a paper that looked like a $100 bill. The first was on August 17, 1892, a fortnight after the one in question was missed. It was on a farm only three or four miles from that of appellant, where they were assisting in threshing. He and Snider were pitching in the field. He says Snider had some paper money there, among which was a $100 bill; that it was not an advertisement, but genuine money; that he looked at it and had it in his hands; just looked over it as Snider showed it to him, as he would any other money, and that it was genuine money, at least he would take it for

that. He did not say he looked at the back of it. He couldn't tell what bank it was on, nor whether it was a bank bill, a greenback, or a gold or silver certificate. He told Snider at the time that he was a fool for carrying his money around in that way.

The next was about the same time, between the 10th and 21st of the month, at a camp meeting in Sugar Grove, nine and a half miles southeast of Paxton. The witness was running a huckster's stand there. He says that Snider, whom he had known very well for seven or eight years, came up to his stand and pulling out what he took to be a $100 bill said he wanted to smoke and wanted witness to change the bill. Snider laid it out flat. Witness did not have it in his hands nor see its back; couldn't tell "what issue or what sort of an issue it was," but from what he saw he took it to be a good bill.

The third occasion was on Monday, the 27th of the same month. The witness was in a buggy, going northwest to Paxton, and when within a mile and a half or two miles of it, met Snider going in the opposite direction in a wagon with well tools on it. He had been to town. When they met they stopped and had some talk about how they were getting along and how much money they were making. They had been well acquainted for eight or nine years, worked and been much together. Witness had been interested in the huckster stand above referred to and was telling how much they had made on it. Snider doubted it and said, "I will bet you $100, you didn't make near that much." Witness replied in a joking way, "Oh, well, you haven't got $100;" to which Snider answered, "I will just show you that I have," and pulled out and showed witness what to him appeared, and he believed to be a $100 bill. It was folded up when he took it out of his pocket, but he unfolded it and showed both sides of it. The witness said, "Of course I thought it strange that Snider had a $100 bill loose in his pocket, but didn't think very much about it."

Mr. Shaw, cashier of the First National Bank at Paxton, testified that he knew appellee by sight; that on the 27th

day of August, 1892, he received from him at the bank a deposit of $115; that he "presumed" it was in bills of different denominations, and was "of the impression" that he had one large bill, a $100 bill, but "would not be positive about that." He said, "to the best of my recollection he had some two or three or four bills, and I think one was for $100. * * * I don't know that I was particularly impressed at the time. It was a common thing to happen. * * * We have a large number of depositors, five or six hundred. * * * I can only say that part of this deposit was a $100 bill as my best impression." He could not say how many people made deposits that day; supposed the usual number; nor tell who deposited on that day, or within a week of it, but by the books, nor testify as to the denomination of the bills deposited unless it was specified in the deposit slip, or was an unusual amount, or there was some special circumstance to make him remember it. His attention was first called to it by appellant, and only about a week before the trial, which was considerably more than two years after the transaction.

It is worthy of notice that the deposit was made on the same day that appellee, going away from Paxton with tools for well boring, met his friend, the witness Martin, and showed him what he took to be a $100 bill. Martin said their talk was brief; that appellee was working for some one and seemed to be in a hurry to go on. The time of day at which the deposit was made or the meeting took place was not shown, but the strong probability from the circumstances is that the deposit was made before appellee left Paxton. Banks usually closed long before the day's work of a farm laborer or a well borer ended. He would hardly have gone on to the place of his job, quit work during working hours and returned to Paxton before the bank closed.

It is not pretended that there were more than one $100 bill, or one likeness of it in evidence. If he had previously deposited such bill, he couldn't have shown it to Martin, and if he had such, it was altogether probable he would have deposited it with the others, rather than carry it about loose

in his pocket. Hence the almost irresistible conclusions are
that he did not deposit it, and also that what he did show to
Martin was not such; and if not, then it is equally probable
that what he showed to the other witnesses was not a gen-
uine bill.

Appellee, who alone certainly knew the facts, positively
testified, that although he saw the handkerchief placed as
stated, he did not touch it; did not deposit nor show to any-
body a genuine $100 bill, and never had one; that what he
had and showed was not a bank bill, nor paper really repre-
senting money of any kind, nor a counterfeit of any, but an
advertisement, such as is often seen, in the likeness of such
and so clear an imitation as might deceive anybody who
only looked at, without handling or examining it; that he
had carried it in his pocket a long time, forgotten of whom
or how he obtained it, paid no particular attention to it and
couldn't describe it at all minutely; had shown it occasion-
ally to the young men in the neighborhood, for their aston-
ishment and his own amusement, so handling and exhibiting
it as to prevent their "catching on," and finally gave it to
Eddie Henry, a grandson of Mr. and Mrs. Strayner, with
whom he (appellee) made his home during much of the time.
They testified that they saw it—she in his possession at
several times in the summer of 1892, and both in that of
the little boy, who also testified that appellee gave it to him
and that after keeping it a week or so he lost it.

The actual possession by appellee of a genuine $100 bill,
after appellant's was missed, was the vital question in the
case. Is it at all strange that the jury found the fact not
proved by this evidence? It did not appear that appellant
ever saw it after he put it in his pocket-book, nor to what
extent, if any, it was exposed to loss before he missed it. If
appellee took it he must have done so almost under the eyes
of its owner, with whom he was working, in a little space,
all the afternoon. His opportunity was hardly as good as
that of the gassing girl in his employ, who was free to roam
all about the mow unnoticed, while appellee could not well
be out of his sight long enough to disturb the handkerchief,

take out the money, wrap and replace the pocket-book, knife and watch just as he found them, without discovery. If he had any reason to suppose there was money there, he knew the owner would very soon miss what was taken and might before they left the mow. They worked on together until appellant got his handkerchief and they went to supper. Appellant says there was nothing strange in appellee's leaving as he did, nor had he any recollection afterward of anything in his conduct or manner during the afternoon to excite suspicion. He knew that appellee was going that evening to George Thompson's to work. He had been working for the farmers in the neighborhood many years. He continued to do so up to the time of the trial. Yet it is claimed that within a few days after the theft, so peculiar in its circumstances, and that exposed him to imprisonment for ten years, he was showing the stolen property, of such unusual character as to attract notice and cause remark, to the young men about there, carrying it loose in his pocket, offering it at a camp meeting in payment for a cigar, and finally depositing it in its original form in a bank where the owner was likely to do business.

Such circumstances were highly improbable in themselves, even upon the supposition of his guilt. The alleged fact of his taking the money was positively denied, and the circumstances tending to prove it were not unreasonably explained. When first charged with it, and the name of a person was given as one who had seen such a bill in his possession—the only one given before the trial—he promptly proposed to go with appellant to see him. After some delay on appellant's part, they did go, and appellant was allowed to see him alone while appellee remained outside. Their accounts of the interview, as reported by appellant when he came out, differ, but the fact is, that he did not produce the party as a witness on the trial, although he resided in Paxton.

Two other circumstances were brought into the case on the part of appellant· which may deserve a brief notice. One was that appellee had once taken some money of George Thompson, without his special authority or knowledge.

This was admitted, and, in our opinion, fairly explained; and if it had not been, was incompetent as evidence. The other was that a week before the trial, in the course of a conversation with a witness who lived a half mile from him and knew him well, in the presence of Miss Strayner, in which, among other things, they talked about counterfeit money, appellee expressed a wish that he had a counterfeit $100 bill, and asked the witness if he could get one for him, but did not state what for, particularly, but for a purpose. They both knew this suit was pending and what it was about. The inference drawn is, that he wanted it to produce on the trial and claim it was what appellant's witnesses saw. But for that purpose it would serve no better than his advertisement. He was, doubtless, already committed to the advertisement theory. How could he want to produce a counterfeit bill, if he got one, for any such purpose, with these witnesses ready to prove how lately he got it? But his advertisement had been lost and he couldn't procure another. He might properly want a counterfeit to test the ability of appellant's witnesses to distinguish a counterfeit from a genuine bill, with no better opportunity for examination than they had, and to show, if he could, that his advertisement was as good an imitation of a genuine bill. We think the inference sought to be drawn far-fetched and unreasonable.

This statement of the evidence shows that the question involved was eminently one to be finally determined by a jury, and that there was quite enough to support their finding.

Among the grounds stated for the motion to set it aside and grant a new trial, was that of newly discovered evidence.

Appellee was asked where he got the money he deposited in the bank, and answered that after so long a time—over two years—he could not state positively. But he had been at work most of his time, economical and saving in his habits, and received it from a number of persons who had owed him for work or for loans. He named eight or nine,

from three or four of whom he got money that he believed went to make up the $115 deposited.

In support of the motion the affidavits of four or five of these named were submitted, showing how much the affiants respectively, had paid him, and when; two of whom fixed the time of their payments at a date shortly after that of the deposit, and two others at a considerable time before—one, of an amount not exceeding ten dollars, as early as the year 1889. But he was shown to have been industrious and saving of his money—having little occasion to spend it except for his clothes. He did not use tobacco nor drink liquor. These affidavits do not tend to impeach his veracity, but rather to show it; nor even his memory. Who could say positively, two years and four months after a deposit of $115 in several bills of no uncommon denomination, just when, where, of whom, and for what he obtained them? Appellee fully admitted that he couldn't. If he did not deposit appellant's bill, nor any proceeds of it, then it was wholly immaterial where or how he got what he did deposit. If the jury believed he did, then also it was of no consequence, for, in that case, they couldn't have believed his denial nor had any faith in his explanations. They did not believe that he deposited it, and it can not be well said that this proof would have compelled a different belief. There was therefore no sufficient ground for a new trial. We find no material error in the record to the prejudice of appellant, and the judgment will be affirmed.